# IN THE SUPREME COURT OF IOWA

No. 54 / 04-1147

Filed January 19, 2007

**STATE OF IOWA,**

Appellee,

vs.

**JAMES ALAN LANE,**

Appellant.

Appeal from the Iowa District Court in and for Jasper County, Paul R. Huscher (motion to suppress) and John D. Lloyd (sentencing), Judges.

Defendant appeals his convictions on drug charges. **AFFIRMED.**

Linda Del Gallo, State Appellate Defender, and Martha J. Lucey, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, Steve Johnson, County Attorney, and Scott Nicholson, Assistant County Attorney, for appellee.

**CADY, Justice.**

In this appeal we must primarily decide if evidence obtained from a consent search at one location that followed an illegal search and seizure at another location must be suppressed. The district court denied the motion to suppress. On our review, we conclude the district court properly admitted the evidence at trial. We also conclude trial counsel was not ineffective in representing the defendant. We affirm the judgment and sentence of the district court.

## I. Background Facts and Proceedings.

James Lane was arrested on February 11, 2004 and charged with two counts of possession of more than five grams of methamphetamine with intent to deliver in violation of Iowa Code section 124.401(1)(*b*)(7) (2003) and two counts of failure to affix a drug tax stamp in violation of Iowa Code sections 453B.3 and 453B.12. Prior to trial, Lane filed a motion to suppress the evidence seized by the State. The facts relevant to the motion were presented at a hearing and at trial. These circumstances form the basis of the pertinent facts in this appeal.

While on patrol, Jasper County deputy sheriff John Pohlman observed Brian Hammer operate a motor vehicle. Pohlman knew Hammer was barred from driving by the Department of Transportation, and that his actions constituted a misdemeanor offense. However, before Pohlman was able to take action, Hammer pulled the vehicle to the side of the road and stopped. Hammer then exited the vehicle and a passenger moved into the driver's seat and drove away. Pohlman pursued the vehicle in order to obtain the license plate number. After obtaining this information, Pohlman returned to the area where Hammer exited the vehicle, and observed him enter a detached garage at John Hoffert's residence.

Pohlman pulled into a nearby driveway to keep surveillance on the garage, and called Lieutenant Fred Oster for backup. Oster arrived within five minutes. Pohlman and Oster then approached the garage to arrest Hammer for driving while barred.

A person later identified as Hedlund was in the process of leaving the garage just as the officers were approaching it. When Hedlund saw the officers, he turned around, reentered the garage and exclaimed, "It's the cops." The officers quickened their approach and entered the garage through the door left open by Hedlund. Upon entering the garage, the officers found Hedlund, Hammer, and Lane. Neither Oster nor Pohlman knew Lane was in the garage, although they knew Lane was sometimes present on the Hoffert property.

Lane was standing at a workbench where there were assorted plastic bags, a knife, a piece of sheet metal, and other tools. Oster saw Lane grab a plastic bag from the workbench, shove it into a large thermal mug, and throw the mug into a bucket on the floor. The officers secured Hedlund, Hammer and Lane in the garage. They immediately placed Hammer under arrest.

Oster looked into the bucket and observed a plastic bag protruding from the mug. Oster lifted the mug and determined the plastic bag contained methamphetamine. The mug also contained digital scales. Oster had prior information that Lane was a large-scale methamphetamine dealer in Jasper County, and carried a large thermal mug to hide, store, and transport methamphetamine. During this time, Lane asked Oster if he had a warrant. Oster responded by asking Lane if he had just graduated from law school, and after Lane replied in the negative, Oster showed Lane his badge and said it gave him the right to do anything he wanted.

The officers placed Lane under arrest, and transported him to jail. Pohlman sought a warrant to search the garage. In the meantime, Oster requested assistance at the scene to provide security in anticipation of obtaining a warrant. Three reserve officers and another deputy responded.

While securing the garage, Oster observed Cathy Hogan driving down the street. Hogan is Lane's girlfriend, and Oster knew she was a drug user. She resided in a house, along with Lane, located less than one-half of a block from the Hoffert garage on the opposite side of the street. Hogan and Lane lived in the rented upstairs portion of the house and shared a bedroom. After Hogan arrived at her residence, Oster and the three reserve officers walked to the house. Oster testified he would not have been at Lane's residence had he not made the arrest of Lane earlier, and that his only purpose in going to the house was to ask for Hogan's consent to search it. Oster knocked on the door of the residence. Hogan's daughter answered the door, let Oster inside, and called for her mother. Hogan came down the stairs and met Oster.

Oster informed Hogan that Lane was under arrest for intent to deliver methamphetamine. Hogan and Oster had a further discussion at the kitchen table downstairs. At this time, Hogan signed a consent to search form that allowed the police to search the upstairs portion of the residence.

Hogan then led Oster upstairs to search the bedroom. Oster found drug paraphernalia specifically for methamphetamine as well as a tan lockbox located on the floor in the center of the room. Oster asked Hogan if she knew who owned the lockbox. She indicated it belonged to Lane. Hogan did not have a key to open the box.

Oster later questioned Lane about the box after advising him of his *Miranda* rights. Lane acknowledged the box was his, and he told Oster the

box contained a half a pound of methamphetamine. Oster was eventually able to open the box after Lane told him where he could find the key. When Oster opened the box, he found a large plastic bag containing over three hundred grams of methamphetamine.

The motion to suppress filed by Lane claimed the initial entry and search of the garage was unlawful and tainted all subsequent searches and seizures, making them unlawful as well. The district court granted Lane's motion in part and denied it in part. The court suppressed the evidence obtained from the warrantless entry and search of the garage. It concluded the entry was illegal because the officers were not in hot pursuit and exigent circumstances were not present. Regarding the evidence obtained from the subsequent consent search of the residence, the court determined that so long as Hogan's consent was voluntary it provided a lawful means of obtaining the evidence. As a result, the district court allowed this evidence to be introduced at trial, concluding the search was legal because Hogan had voluntarily given her consent.

The case proceeded to trial on one count of possession of more than five grams of methamphetamine with the intent to deliver and one count of failure to affix a drug tax stamp. These charges arose out of the drugs found in Lane's residence.

**II. Issues.**

This appeal presents two issues. First, Lane alleges the district court erroneously denied his motion to suppress. Second, he claims ineffective assistance of counsel. We discuss each issue in turn.

### III. Motion to Suppress.

### A. Standard of Review.

Lane claims the district court should have granted his motion to suppress on federal and state constitutional grounds. Therefore, our review is de novo. *State v. Freeman*, 705 N.W.2d 293, 297 (Iowa 2005). This review requires " 'an independent evaluation of the totality of the circumstances as shown by the entire record.' " *State v. Turner,* 630 N.W.2d 601, 606 (Iowa 2001) (quoting *State v. Howard*, 509 N.W.2d 764, 767 (Iowa 1993)). In doing so, we give deference to the factual findings of the district court due to its opportunity to evaluate the credibility of the witnesses, but are not bound by such findings. *Id.*

### B. Applicable Law.

Lane's motion to suppress sought to exclude evidence obtained not only after consent to search was obtained, but also after an initial police illegality. In *State v. Reinier*, 628 N.W.2d 460, 467–68 n.3 (Iowa 2001), we stated the following:

> When a claim of consensual search is preceded by illegal police action . . . , the government must not only show the voluntariness of the subsequent consent under the totality of the circumstances, but must also establish a break in the illegal action and the evidence subsequently obtained under the so-called "fruit of the poisonous tree" doctrine.

(Citations omitted.) Thus, there are two issues to analyze in a consent-to-search case such as this: (1) voluntariness under the totality of the circumstances, and (2) exploitation under the fruit of the poisonous tree doctrine. *Id. See generally* 4 Wayne R. LaFave, *Search and Seizure* § 8.2, at 50–141 (4th ed. 2004) [hereinafter LaFave] (discussing the validity of consent). We are reminded the two questions are not the same, and "consequently the evidence obtained by the purported consent should be

held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality." LaFave § 8.2(d), at 76.[1]

The analysis by the district court only considered the question of voluntariness. It determined "if [Hogan's] consent was voluntarily given, the Fourth Amendment is not implicated." On our review, we apply both tests to decide if Hogan's consent was voluntary and not an exploitation of the prior illegality.

### 1. Voluntariness.

The State has the burden to prove the consent was voluntary, *see Reinier*, 628 N.W.2d at 465, and voluntariness is a "question of fact to be determined from the totality of all the circumstances," *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854, 862 (1973). The question of voluntariness requires the consideration of many factors, although no factor itself may be determinative. *See generally* LaFave § 8.2, at 50–141 (discussing several factors bearing upon the validity

---

[1]In cases such as these, where evidence is obtained after an initial police illegality and after consent to search is received, it is important to note "courts do not consistently follow the same approach." LaFave § 8.2(d), at 76. Some courts choose to address the issue solely under a " 'totality of the circumstances' voluntariness test, in which case the court undertakes to ascertain whether the prior illegality and the other circumstances resulted in coercion of the person who purportedly consented to the search." *Id.* (footnote omitted) (the voluntariness test). LaFave adds that other courts address "whether the consent was a fruit of the prior illegality," thereby utilizing the "fruit of the poisonous tree" doctrine. *Id.* (footnote omitted) (the fruits test). We realize there is an "overlap of the voluntariness and fruits tests that often a proper result may be reached by using either one independently." *Id.* However, we have incorporated both tests to be more thorough and to squarely address the connection between the prior illegality and the subsequent seizure of evidence after consent. *See Reinier*, 628 N.W.2d at 467–68 n.3; *accord United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (noting in addition to proving voluntariness, "[w]e require the government to demonstrate that any taint of an illegal search or seizure has been purged or attenuated not only because we are concerned that the illegal seizure may affect the voluntariness of the defendant's consent, but also to effectuate the purposes of the exclusionary rule"). Other states have done likewise. *See People v. Rodriguez*, 945 P.2d 1351, 1364 (Colo. 1997); *State v. Hight*, 781 A.2d 11, 14 (N.H. 2001); *People v. Borges*, 511 N.E.2d 58, 59–60 (N.Y. 1987); *State v. Robinson*, 412 S.E.2d 411, 414 (S.C. 1991); *State v. Hansen*, 63 P.3d 650, 662–63 (Utah 2002).

of consent). In *United States v. Va Lerie*, 424 F.3d 694, 709 (8th Cir. 2005), the Eighth Circuit noted particular attention must be paid to the

> *personal characteristics* of the [consenter], such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of detention or questioning, the substance of any discussion between the [consenter] and police preceding the consent, whether the [consenter] was free to leave or was subject to restraint, and whether the [consenter's] contemporaneous reaction to the search was consistent with consent.

(Emphasis added.) (Citation omitted.) In this case, Hogan's personal characteristics are not in dispute. She was an adult mother with an eighth grade reading level. There was no indication she was under the influence of any drugs at the time of her consent. In addition, although her exact experience with the law was unclear, she had previous dealings with Oster and they had known each other for many years.

The context in which Oster received Hogan's signature was disputed. Hogan testified she did not read the consent to search form, thought she was signing a warrant, and no lengthy discussion at the kitchen table occurred prior to the time she signed the form. Moreover, Hogan testified Oster said he would search the house without her consent. On the other hand, Oster testified Hogan read the consent form, that he verbally explained the consent form to her, and that Hogan appeared to know what she was signing. Oster also testified he did not coerce her to sign the form or indicate he would search without her consent, and a lengthy discussion at the kitchen table took place prior to receiving her consent. Pohlman testified he heard Oster explain the consent form and ask Hogan for her consent, Hogan agreed to sign the form, no coercion was used to obtain her consent, and Oster and Hogan were at the kitchen table for at least five minutes prior to receiving her consent.

The district court stated it "carefully considered the conflicts in testimony" and found the "officers to be more credible." While we are not bound by these determinations, we give deference to the credibility determinations by the district court. *Turner,* 630 N.W.2d at 606. Moreover, it is undisputed Hogan's daughter allowed the officers inside the residence, *see Reinier*, 628 N.W.2d at 469 (noting that written consent received after an *uninvited* entry weighs against voluntariness), Oster and Hogan knew each other for years, Hogan was informed of her boyfriend's arrest, *see id.* (noting that the officers did not mislead the consenter), Oster asked for Hogan's signature downstairs at the kitchen table, Hogan signed the consent form at the kitchen table, and Hogan's contemporaneous reaction was to lead the officers upstairs to perform the search. Furthermore, when Hogan signed the consent form there was no indication that *she* was going to be arrested. *See State v. Holland*, 389 N.W.2d 375, 381 (Iowa 1986) (noting the lack of evidence suggesting the consent was secured by threats or coercion because "[b]y the time [the consenter] consented to the search she had been told she was not under arrest and had no reason to believe she would again be taken into custody").

The consent form stated:

> I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me . . . .

Hogan signed her name above this boilerplate language. Immediately below it, Hogan printed her full name, date of birth, and social security number. While this factor is not determinative, the circumstances indicate that Hogan voluntarily consented. *See Reinier*, 628 N.W.2d at 467 (consent may be express or implied or by gestures and non-verbal conduct); *Howard,* 509

N.W.2d at 767 (noting the use of a consent to search form similar to the one Hogan signed, and holding such consent was voluntary).

The only factors that show any sign of involuntariness was the testimony of Hogan indicating that Oster planned to search the residence without her consent, *see* LaFave § 8.2(c), at 69 (noting that a threat to seek or obtain a search warrant indicates involuntariness), Hogan's poor reading ability, *see id.* § 8.2(e), at 90 (noting the consenter's maturity, sophistication, physical, mental and emotional state is a factor), and the number of police officers present at the Lane residence, *see id.* § 8.2(b), at 61–62 ("If the police make a show of force at the time the consent is sought, or if the surroundings are coercive in other respects, this is to be taken into account."). However, the district court found Hogan's testimony was not credible. In addition, Hogan's eighth grade reading ability would not prohibit her from reading or understanding the consent to search form. Finally, the presence of police officers at the time Hogan signed the consent form was singular and did not otherwise indicate an improper showing of force. Only Oster was present when Hogan signed the consent form. The three remaining officers and Pohlman were not involved. One stayed outside the residence completely, and the other two were in the hallway. Pohlman testified that he was only present for a short time in the kitchen, and left before Hogan signed the consent to search form. Hogan's testimony was actually consistent with this view. She agreed "[i]t was just Fred [Oster] and me through the whole thing." Furthermore, Hogan knew Oster, the initial entry occurred downstairs (Lane and Hogan rented the upstairs), and there was no credible evidence that the officers claimed they had authority to search the residence without consent. *See Reinier*, 628 N.W.2d at 468–

69 (finding involuntary consent when the police asserted authority to enter the house and to search it).

After evaluating the totality of the circumstances, we conclude Hogan's consent was voluntary. Thus, we proceed under the fruit of the poisonous tree doctrine to determine the presence of exploitation.

### 2. Exploitation.

The phrase "fruit of the poisonous tree" refers to indirect or secondary evidence obtained as a result of a prior illegality. *See Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 268, 84 L. Ed. 307, 312 (1939) (coining the phrase for the first time). Under the doctrine, the "fruits" of the prior illegality are excluded if they were an exploitation of that prior illegality. *See Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441, 455 (1963). Thus, the doctrine operates as an extension of the exclusionary rule. *See State v. Hamilton*, 335 N.W.2d 154, 158 (Iowa 1983) (writing that originally the exclusionary rule suppressed evidence "discovered as a result of illegal government activity," and that later "the concept was expanded to include other, indirect, evidence 'tainted' by the original illegality" known as the "fruit of the poisonous tree" (citations omitted)). In *Reinier* we stated the question of exploitation, as applied to consent cases, was whether the government had "establish[ed] a break in the illegal action and *the evidence subsequently obtained* under the so-called 'fruit of the poisonous tree' doctrine." 628 N.W.2d at 467–68 n.3 (emphasis added). We also indicated it was unnecessary to "consider whether there was a break in the illegal entry and *the subsequent consent*" when the consent is not voluntary. *Id.* (emphasis added).

A subtle distinction exists between the two statements in *Reinier* that requires our explanation. The first statement looks for a break between the

initial illegality and the *evidence* seized after the consent. The second statement suggests the appropriate inquiry is to look for a break between the initial illegality and the *consent* obtained. Thus, while the first statement does not assume the possibility that the consent is a "fruit" of the poisonous tree, the second specifically does.

We find the latter analysis appropriate. We do so because in consent cases there is no logical separation between the consent and the evidence seized as a result of the consent. They are the practical equivalent of each other. The evidence naturally follows the consent.

We realize this approach is technically inconsistent with the principle announced in *Wong Sun*, where the United States Supreme Court held that the "apt question" in a fruit of the poisonous tree case is "whether, granting establishment of the primary illegality, the *evidence* to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. at 487–88, 83 S. Ct. at 417, 9 L. Ed. 2d at 455 (emphasis added). The inconsistency occurs because "consent" is not technically "evidence." The evidence in consent cases is the evidence seized after the consent to search has been obtained. Thus, the appropriate inquiry under *Wong Sun* seems to be whether the *evidence*—not the consent—was obtained through exploitation or "instead by means sufficiently distinguishable." *Id.* at 487–88, 83 S. Ct. at 417, 9 L. Ed. 2d at 455. Therefore, under this inquiry the consent could operate as a "means sufficiently distinguishable."

Nevertheless, we find the appropriate inquiry in a consent case to be whether the *consent* was obtained through exploitation or other sufficiently distinguishable means. We do so because there is no practical reason for

distinguishing between the evidence seized after the consent and the consent itself. The evidence cannot be seized if consent is not obtained. If the consent is an exploitation of the illegality, the evidence is as well. Moreover, this inquiry properly prevents the consent from becoming a "means sufficiently distinguishable." If we treat the consent as a possible alternative means by which the police obtained the evidence, it would inevitably lead to asking only one question: whether the consent was voluntary. *See* David Anthony, Note, *State v. Zavala: Consent to Search as Attenuating the Taint of Illegal Searches and Seizures*, 38 Idaho L. Rev. 135, 142, 156–59 (2001) ("[E]ven if a court cites to the voluntariness and causal connection tests, the way it applies the causal connection test may look no different than the voluntariness test. This can occur by . . . using the voluntariness of the consent as a sufficient 'intervening circumstance.'" (Footnote omitted.)). We have already stated that we have adopted a two-part voluntariness *and* exploitation analysis. Under this two-part analysis, the consent must not be considered as a possible alternative means for obtaining the evidence because it would not allow consideration of whether the consent was an exploitation of the prior illegality. Thus, the consent should be treated as if it were the "evidence" sought to be excluded.

Our interpretation of *Wong Sun* in this manner is not radical. The federal circuits addressing this issue consistently frame the question in this manner. *See, e.g.*, *United States v. Snype*, 441 F.3d 119, 134 (2d Cir. 2006) (framing the question as whether the taint from the illegal entry had dissipated prior to the consent); *United States v. Jaquez*, 421 F.3d 338, 342 (5th Cir. 2005) (determining whether there was sufficient attenuation "to break the chain of events between the Fourth Amendment violation and the consent"); *United States v. Washington*, 387 F.3d 1060, 1072 n.12 (9th Cir.

2004) (determining whether the "prior illegality is sufficiently connected to the subsequent consent"); *United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003) ("[T]he causal chain between the illegal seizure and the consent must be broken."); *United States v. Robeles-Ortega,* 348 F.3d 679, 683 (7th Cir. 2003) ("The critical issue is whether the consent was obtained by means sufficiently distinguishable from that illegal and violent entry so as to be purged of the primary taint."); *United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003) (stating the question as "whether a voluntary consent was obtained by exploitation of an illegal seizure"); *United States v. Dickson,* 64 F.3d 409, 411 (8th Cir. 1995) (holding in the alternative "that the police obtained the woman's consent 'by means sufficiently distinguishable to be purged of the primary taint' " (citation omitted)); *see also* LaFave § 8.2(d), at 76 ("[T]he evidence obtained by the purported consent should be held admissible only if it is determined that the *consent* [is] not an exploitation of the prior illegality." (Footnote omitted.) (Emphasis added.)). However, courts are not always consistent with how they state the analysis. *See, e.g., United States v. Becker*, 333 F.3d 858, 862 (8th Cir. 2003) (noting in a consent case the court must "determine[] whether the taint is purged from the evidence seized"). We, of course, have not escaped this inconsistency. *See Reinier,* 628 N.W.2d at 467–68 n.3. Thus, while it may seem technical to make the distinction here, we do so to finally recognize the difference, end any confusion, and appropriately frame the issue before us.

With this in mind, we read "consent" into the Supreme Court's admonition in *Wong Sun*:

> We need not hold that all evidence [or consent] is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt

question in such a case is "whether, granting establishment of the primary illegality, the evidence [or consent] to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

371 U.S. at 487–88, 83 S. Ct. at 417, 9 L. Ed. 2d at 455 (citation omitted); *see also Hudson v. Michigan*, ___ U.S. ___, ___, 126 S. Ct. 2159, 2164, 165 L. Ed. 2d 56, 64-65 (2006) (recognizing and applying the *Wong Sun* rule). This approach, therefore, presents the ultimate inquiry that guides us in determining whether Hogan's consent, and consequently the evidence seized as a result, was an exploitation of the illegal search of Hoffert's garage. This inquiry is an exploitation analysis, or an application of the attenuation limitation to the fruit of the poisonous tree doctrine. *See* Joshua Dressler, *Understanding Criminal Procedure* § 20.08, at 405 (4th ed. 2006) (calling the *Wong Sun* rule the "attenuated connection principle"); *see also* Gary D. Spivey, Annotation, *"Fruit of the Poisonous Tree" Doctrine Excluding Evidence Derived From Information Gained in Illegal Search*, 43 A.L.R.3d 385, 391 (1972) [hereinafter Spivey] (noting the *Wong Sun* rule incorporates the independent source doctrine and the attenuation limitation).[2] The attenuation limitation states evidence (or in this case, consent) is not fruit of the poisonous tree if it is sufficiently attenuated from

---

[2]The independent source doctrine removes the taint of a prior illegality if the police obtained the same information or evidence through means independent of the illegal conduct. Spivey, 43 A.L.R.3d at 391. Because we ultimately find the consent was not an exploitation under the attenuation limitation, we need not consider the application of the independent source doctrine. We note, however, that application of the independent source doctrine is not particularly apt in this case because Hogan's consent occurred after the illegal search and arrest at the Hoffert garage. Thus, the two events are not completely independent of each other. We recognize the independent source doctrine can operate even when there is a de facto causal connection, but this occurs only when the evidence sought to be excluded is "the product of a concurrent investigative process in no way dependent upon information learned through lawless official acts." *See id.* at 391. There is no allegation of a concurrent investigative process in this case so we decline to address the independent source doctrine. Of course, if Hogan had consented prior to the illegality or during a concurrent investigative process, our approach would be different.

the original illegality. *See State v. Seager*, 571 N.W.2d 204, 210–11 (Iowa 1997) (explaining the attenuation limitation). In other words, consent is fruit of the poisonous tree if it is an exploitation of the prior illegality.

We must address several factors to determine if Hogan's consent was an exploitation of the previous illegality. In *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S. Ct. 2254, 2262–63, 45 L. Ed. 2d 416, 427 (1975), the United States Supreme Court identified important factors to consider in a confession case. These factors included the temporal proximity between the illegality and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Id.* at 603, 95 S. Ct. at 2262–63, 45 L. Ed. 2d at 427; *see State v. McCoy*, 692 N.W.2d 6, 24 (Iowa 2005) (applying those factors). The present case, of course, is not a confession case, but a consent case. Nevertheless, the issues in each case are similar: whether the confession, or consent, is an exploitation of the prior illegality. The United States Supreme Court has recognized this similarity, *see Florida v. Royer*, 460 U.S. 491, 501, 103 S. Ct. 1319, 1326, 75 L. Ed. 2d 229, 238–39 (1983), and other courts have consistently applied the factors identified in *Brown* to consent cases, *see, e.g., Rodriguez*, 945 P.2d at 1364 (analyzing the three factors identified in *Brown*); *Hight*, 781 A.2d at 14 ("[W]e find instructive the [three] factors considered relevant by the United States Supreme Court [in *Brown*]."); *Borges*, 511 N.E.2d at 59–60 (ordering the trial court to consider the issue according to, *inter alia*, the factors set forth in *Brown*); *Hansen*, 63 P.3d at 665–66 ("The United States Supreme Court has noted three factors that have particular relevance in reviewing the facts: [temporal proximity, intervening circumstances, and the purpose and flagrancy of the illegal conduct].").

Courts have additionally been careful to recognize that while exploitation cases "must focus on [the] three specific factors [articulated in *Brown*]," *United States v. Simpson*, 439 F.3d 490, 495 (8th Cir. 2006), "consideration must be given to a variety of factors, including but not limited to the [factors enunciated in *Brown*]," *Borges*, 511 N.E.2d at 59–60. Thus, the "relevant factors will vary from case to case and each case must be individually considered on the particular facts and circumstances presented with due regard for the purposes sought to be served by the exclusionary rule." *Id.*; *see State v. Hall*, 115 P.3d 908, 926 (Or. 2005) (noting "a fact-specific inquiry into the totality of the circumstances" is necessary); *Hansen*, 63 P.3d at 665–66 (noting the relevance of all facts, and that the three factors articulated in *Brown* are of particular relevance); *Hight*, 781 A.2d at 14 (finding the three *Brown* factors simply instructive); *see also* Spivey, 43 A.L.R.3d at 392 ("Whether evidence derived from information obtained in an unlawful search is to be excluded as fruit of the poisonous tree depends upon . . . the particular facts and circumstances presented in the individual cases."). In other words, the factors do not generate a general inquiry, but require the particular circumstances of each case to drive the analysis. We now turn to analyze the appropriate factors involved in this case, starting with the three factors specified in *Brown*.

### a. Temporal Proximity.

The record does not clearly reveal how much time elapsed between the initial illegal entry into the Hoffert garage and illegal arrest of Lane, or the subsequent consent search of Lane's residence. The record indicates the consent was obtained after Lane and Hammer were transported to jail, and after Oster's call for backup had arrived. In addition, the record reveals Pohlman had time to apply for the search warrant of the garage before

Hogan signed the consent form. Thus, while this record indicates some time had passed, it is clear that temporal proximity was fairly close in this case, possibly less than one or two hours. This is akin to the temporal proximity involved in *Brown* and seems to suggest exploitation. *See Brown*, 422 U.S. at 604, 95 S. Ct. at 2262, 45 L. Ed. 2d at 428 (finding the passage of less than two hours indicated exploitation); *McCoy*, 692 N.W.2d at 24–25 (finding two hours "relatively short"). Yet, additional facts must be considered to determine if this factor actually supports exploitation or attenuation.

It is especially important in this case that the defendant Lane was not the one who consented to the search of the Lane residence. Lane's girlfriend, Hogan, consented to the search. Hogan had no knowledge of the illegal circumstances surrounding Lane's arrest because she was not present at the time of the illegal entry into the Hoffert garage. She only knew that Lane was under arrest. Moreover, Hogan gave her consent, and the challenged search occurred, in a place entirely different from the initial illegality. Finally, Oster asked for Hogan's consent because he saw her arrive home while he was securing the Hoffert garage.

These additional facts are important because close temporal proximity is less relevant in determining the existence of exploitation when a person other than the defendant consents. *See Simpson*, 439 F.3d at 495. "In these cases, there is 'no chance that the police have exploited an illegal arrest by creating a situation in which the criminal response is predictable.' " *Id.* at 495 (quoting *United States v. Green*, 111 F.3d 515, 522 (7th Cir. 1997)). When the *defendant* consents to a search, temporal proximity is relevant because the closer the time "between the illegal arrest and the defendant's consent . . . the more likely the defendant's consent

was influenced by, or the product of, the police misconduct." *Id.* at 495 n.3. That cannot be the case here, however, as the police did not obtain consent from the defendant. *Cf. United States v. Yousif*, 308 F.3d 820, 831 (8th Cir. 2002) ("[W]e note that little time elapsed between the initial [illegal] stop of [the defendant's] vehicle and [the defendant's] consent to the search."); *McCoy*, 692 N.W.2d at 24-25 (noting the similarities between three United States Supreme Court cases and *McCoy*, in which only a short time elapsed between the illegal conduct visited upon the *defendant* and the *defendant's* confessions).

The case of *United States v. Mendoza-Salgado*, 964 F.2d 993 (10th Cir. 1992), is particularly instructive.[3] In *Mendoza-Salgado* the consent was not given by the defendant, but by his wife. 964 F.2d at 1000. The court evaluated temporal proximity, stating: "Considered alone, the proximity of the agent's [illegal] entry to [the wife's] consent reveals little about whether the thirty to forty-five minutes that elapsed had any effect on *her* decision to permit the search." *Id.* at 1012 (emphasis added). This observation was made even though the wife was present during the illegal entry and witnessed her husband's arrest. *Id.*; *see also Snype*, 441 F.3d at 135 (noting that even though the consenter was present during the unlawful entry, and only twenty minutes elapsed, intervening circumstances

---

[3]It should be noted that the Tenth Circuit has said it "does not believe that under *Wong Sun* or *Brown*, 'the Government is required to show attenuation beyond a finding of voluntary, valid consent under Fourth Amendment standards.'" *Mendoza-Salgado*, 964 F.2d at 1013 (citation omitted). Nevertheless, the court applied the *Brown* factors and found the "consent sufficiently purged the agent's warrantless entry of any primary taint, thereby rendering the search valid." *Id.* Subsequently, the Tenth Circuit recognized this discrepancy and stated "[t]he dual requirement of voluntariness and sufficient independence from the prior illegal arrest to purge the taint of that arrest was blurred in our [previous] opinion[s]." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994). The court then set forth its true intentions and "reiterate[d] that not only must the government show that consent is voluntary in fact, but it must also demonstrate a break in the causal connection between the illegality and the consent." *Id.*

sufficiently attenuated the taint). In this case, Hogan had no personal knowledge of the illegal entry into the Hoffert garage or the police actions that occurred there. Thus, this is an even stronger case for attenuation because these facts could not have influenced her consent. She only knew that her boyfriend was under arrest. Thus, the temporal proximity factor, when considered with all of the facts and circumstances, does not support exploitation.

### b. Presence of Intervening Circumstances.

Initially, we recognize Hogan's consent cannot alone be an intervening circumstance. This is because we are searching for intervening circumstances between the police illegality and the consent.[4] Intervening circumstances must be "sufficiently important," and can include "release from custody, an appearance before a magistrate, or consultation with an attorney." *Washington*, 387 F.3d at 1073-74 (citations omitted). The absence of these circumstances often suggests exploitation.

A more widely recognized intervening circumstance is whether the police notified the person of his or her right to refuse consent. *See, e.g.*, *United States v. Perry*, 437 F.3d 782, 786 (8th Cir. 2006); *Hight*, 781 A.2d at 15. There is a difference, however, between notifying a person of his or her right to refuse, and simply obtaining a person's signature on a consent to search form. At least one court has recognized that a signature by a defendant on a consent to search form is not an intervening circumstance when it is unaccompanied by other facts. *Washington*, 387 F.3d at 1074; *see also Robeles-Ortega*, 348 F.3d at 683–84 (finding an agreement to sign a consent form distinct from other types of intervening circumstances

---

[4]Treating the consent as an intervening circumstance would be tantamount to treating it as a "means sufficiently distinguishable" under the fruit of the poisonous tree doctrine. We declined to do this for the reasons previously stated.

previously found sufficient). In so holding the *Washington* court noted that it was "unclear whether [the defendant] actually read the form before signing it," but added that it was clear that "the form was never read to [the defendant]." 387 F.3d at 1074 n.14. Those facts are unlike the present case. The credible testimony revealed that Oster explained the consent to search form to Hogan and that she read it. This was supported by Hogan's signature above the language indicating her right to refuse consent, and Hogan's additional markings immediately below that language.

The additional facts discussed in connection with the temporal proximity factor also weigh heavily on the analysis of intervening circumstances. Even if it was unclear whether Hogan was notified of her right to refuse consent, this case is still dissimilar from *Washington*. The court in *Washington* concluded the signing of the consent to search form was not a sufficient intervening circumstance because such a signature did not "have a tendency to distance the suspect from the coercive effects of the temporally proximate constitutional violations." 387 F.3d at 1074. *Hogan's* signature, however, does distance Lane from the coercive effects of the prior illegality because Hogan had no part in the prior illegality. Her consent is much more distant (and hence, less of an exploitation) from whatever coercive effects the illegal arrest would have presented in obtaining Lane's consent.

It is also important to recognize that Hogan's consent explains why the absence of intervening circumstances such as release from custody, appearance before a magistrate, and consultation with an attorney are of no consequence in this case. We acknowledge, prior to giving her consent, neither Hogan nor Lane was released from custody (Hogan was never in custody), neither appeared before a magistrate, and neither consulted with

an attorney. Yet, these circumstances are irrelevant in this case because Hogan was the one who consented. *See United States v. Williams*, 431 F.3d 296, 299 (8th Cir. 2005) (recognizing as important that at the time of consent, the consenter was "not in custody or being detained when he consented"). These circumstances would have been important had Lane given his consent, but this is not the case. Therefore, the absence of these circumstances *vis a vis* Hogan's consent are not relevant and do not favor exploitation.

In *State v. Cates*, 522 A.2d 788, 792 (Conn. 1987), the defendant's girlfriend gave the police voluntary consent to seize stolen property located at the defendant's home. When addressing the issue of exploitation and the presence of intervening circumstances, the court emphasized the defendant was not the one who gave the consent, but rather his girlfriend. *Cates*, 522 A.2d at 792. Because of this distinction, the court noted it was appropriate to evaluate that consent based on the United States Supreme Court's decision in *United States v. Ceccolini*, 435 U.S. 268, 98 S. Ct. 1054, 55 L Ed. 2d 268 (1978). *Cates*, 522 A.2d at 792 (declaring "[t]he reasoning of the *Ceccolini* court can be easily applied to the present case"). In *Ceccolini*, the Court considered whether the in-court testimony of a witness was fruit of the poisonous tree because of a previous illegal search whereby the police initially questioned the witness out of court. 435 U.S. at 277, 98 S. Ct. at 1060, 55 L. Ed. 2d at 277. The Court observed:

> The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.

*Id.* Thus, if the circumstances (time, place and manner) show the initial questioning, or in this case the consent, was given with "detached reflection and a desire to be cooperative," it indicates the presence of intervening circumstances that break the causal chain.

In the present case, the police received Hogan's consent a short time after illegally arresting Lane. However, for the reasons already stated, this is less relevant when someone other than the defendant provides the consent. *See Simpson,* 439 F.3d at 495. In addition, the place of the consent was at a different location than the place of Lane's arrest. Moreover, consent was received in the downstairs of the house, not in a squad car or at the police station. *See Cates,* 522 A.2d at 792 (noting that the consent was obtained "at the threshold of the apartment and not in a police station or vehicle"). Finally, the police received Hogan's consent by identifying themselves, explaining their purpose, informing Hogan that Lane was under arrest, *see id.* (noting the "proper manner in which the officers conducted themselves" by "identifying themselves . . . explain[ing] the purpose of their visit" and informing the consenter why they were there), explaining the consent to search form to her, and receiving her signature on the form, *see United States v. Oguns,* 921 F.2d 442, 447–48 (2d Cir. 1990) (holding that "intervening circumstances" diminished the taint of the federal agent's unlawful entry because "the agents read to [the defendant] a consent to search form, indicating [his] right to refuse to consent to a search[,]" and the defendant read the form himself and signed it). Oster testified that Hogan was "100% cooperative from start to finish." This reflects evidence of "detached reflection and a desire to be cooperative." Hogan was completely detached from the prior illegality.

Also instructive is *Snype*, where a third party consented to a search that revealed evidence leading to the defendant's conviction. 441 F.3d at 127. The defendant alleged the third party's consent was involuntary and an exploitation of the prior illegality because it came after a forcible entry "by a heavily armed SWAT team that initially secured her and her boyfriend in handcuffs and raised the possibility of taking the couple into custody while placing [her] young daughter in protective care." *Id.* at 131. After finding her consent was voluntary, the court further found her consent was not an exploitation because of certain intervening circumstances. *Id.* at 132–35. These circumstances were that "the entering SWAT team left her apartment, [the defendant] was arrested and removed from the premises, [her] own liberty was restored, and she was allowed to call her sister to come help with the care of her young child." *Id.* at 135. The court held this was a "complete change in circumstances," and it "effectively replaced the fearful atmosphere of the initial forcible entry with relative calm." *Id.*

In the present case, we ultimately need only consider the atmosphere of the police encounter with Hogan at the Lane residence. This is because even if we assume the illegal entry into the Hoffert garage created a fearful atmosphere, there is no indication Hogan had any knowledge of it. Therefore, we need only consider the circumstances where Hogan consented. By all indications, the encounter with Hogan was calm throughout. Lane was never present either—Lane was arrested and taken to jail outside of Hogan's presence. Hogan's liberty did not need to be restored because it was never taken away. Finally, while Hogan testified she was concerned about her young daughter, Oster testified he specifically requested Hogan to ask her daughter to leave so they could speak in private. Her daughter then left to watch TV; her only involvement was

letting the officers inside. Thus, this is a case where the facts weigh even more heavily against exploitation than they did in *Snype.*

Finally, Hogan's coincidental arrival during Oster's security of the garage is another important fact made evident by *Dickson.* In *Dickson* the police had illegally searched a car occupied by the defendant and a woman. 64 F.3d at 410. The illegal search turned up keys to the woman's apartment and an envelope with the woman's name on it. *Id.* Later, the police used this information to obtain a search warrant for the woman's apartment. *Id.* Simultaneously, while the police executed the search warrant, the woman arrived at her apartment and consented to the search. *Id.* The court, as an alternative holding, found the search of the apartment was not an exploitation of the prior illegal search of the car because the "police obtained the woman's consent 'by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* at 411 (citation omitted). The critical fact was that there was "no evidence in the record that the woman's arrival at the apartment was coerced (she was not in custody at that time)." *Id.* In *Dickson* the woman just happened to arrive at her apartment when the police were there. *Id.* at 410. The court stated, "it was not the envelope with her name on it that led the police to ask for her consent to search, but, instead, her arrival at and presence in the apartment itself." *Id.*

Hogan similarly just happened to arrive home when Oster was securing the Hoffert garage. As in *Dickson,* it was not the previous information the police had obtained during the illegal search that led Oster to ask for Hogan's consent. *See id.* (noting the arrival of the consenter was the reason for obtaining the person's consent). Instead, it was her coincidental arrival home that motivated Oster to seek her consent. Of course, it is true the previous information learned from the illegality

attracted the police to the apartment in *Dickson,* and attracted Oster to Lane's residence in this case. Nevertheless, the consent received was not an exploitation of that illegality but obtained by means sufficiently distinguishable. The consent was obtained through sheer happenstance of the consenter's arrival. In the end, the intervening circumstance factor, like the temporal proximity factor, weighs against exploitation.

### c. Purpose and Flagrancy of Official Misconduct.

This factor "is considered the most important factor because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct." *Simpson,* 439 F.3d at 496; *see also Brown,* 422 U.S. at 603–04, 95 S. Ct. at 2261–62, 45 L. Ed. 2d at 427 ("The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, *particularly,* the purpose and flagrancy of the official misconduct are all relevant." (Emphasis added.)); *McCoy,* 692 N.W.2d at 24 (same). Purposeful and flagrant conduct exists when

> (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed "in the hope that something might turn up."

*Simpson,* 439 F.3d at 496 (quoting *Brown,* 422 U.S. at 605, 95 S. Ct. at 2254, 45 L. Ed. 2d at 428).[5]

The State concedes the officer's entry into the Hoffert garage was illegal because it failed to preserve this issue on appeal. Despite having

---

[5]We note this factor involves two questions, as "purpose" and "flagrancy" is separated by the conjunction "and." Therefore, we address both questions and consider each in determining whether the consent was an exploitation of the prior illegality. We recognize that some courts fail to evaluate both questions and rely on only one for their determination. *See Washington,* 387 F.3d at 1075 n.17 ("In reciting the third attenuation factor, courts usually choose a conjunctive phrasing ('purpose and flagrancy'), but then find in favor of taint if there is evidence of *either* purposeful extraction of evidence or flagrant illegality."). We, however, choose to address both for completeness, keeping in mind the presence of either one alone or both of them together could be dispositive in a given case.

probable cause to arrest Hammer, no exigent circumstances were present for the police to enter the garage. This suggests that the officer's illegal entry into the garage was flagrant. In addition, the record reflects that when Oster arrested Lane, Oster held up his badge and said it gave him the right to do anything he wanted. Thus, the flagrancy of the police misconduct, at first glance, suggests Hogan's consent was obtained through exploitation.

The purposes of the police conduct, however, suggest otherwise. In *Brown* the Court recognized the police misconduct was obvious, but the Court added the "arrest, both in design and execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up." 422 U.S. at 605, 95 S. Ct. at 2262, 45 L. Ed. 2d at 428. This was not the case here. Oster and Pohlman entered the garage to arrest Hammer, whom they had probable cause to arrest for driving while barred. Their sole purpose in entering the garage was to arrest Hammer. Their purpose was not investigatory nor was it to arrest Lane. They did not even know Lane was inside.

Moreover, the unique facts of this case as applied to the purpose and flagrancy factor further militate against exploitation. In *Brown* the Court noted "[t]he manner in which [the defendant's] arrest was affected gives the appearance of having been calculated to cause surprise, fright, and confusion." *Id.* This, the Court noted, was important because it showed the execution of the arrest furthered their investigatory objectives. *Id.* In this case, the facts do not conclusively indicate the officers intended to cause "surprise, fright, and confusion"—*i.e.* a situation whereby consent would be more easily obtained. *See id.*; *see also Robeles-Ortega*, 348 F.3d at 684 (finding evidence of surprise, fright and confusion when at least five officers

broke down the door and upon entering brandished guns and ordered the occupants to lie down on the floor); *United States v. Maez*, 872 F.2d 1444, 1457 (10th Cir. 1989) (finding evidence of surprise, fright and confusion when the defendant felt dizzy and vomited during his interrogation); *State v. Monteleone*, 123 P.3d 777, 783 (N.M. Ct. App. 2005) (noting the knocking on windows and doors at night and awakening the defendant by such means causes surprise, fright and confusion), *cert. granted*, 124 P.3d 565 (N.M. 2005). Oster waited for Pohlman to arrive, and then they both walked toward the garage. The officers did not enter the garage until they confronted Hedlund. No doubt those inside were surprised by the officers' arrival, and their arrival may have caused them fright and confusion.

Most important, however, is that the circumstances relating to the arrest of Lane, if they did in fact cause "surprise, fright, and confusion," did not have any significant impact upon Hogan's consent. *See People v. Boyer*, 768 P.2d 610, 626 (Cal. 1989) (finding that even where the defendant spoke with his girlfriend after police misconduct was visited upon him, that the girlfriend's subsequent consent was not an exploitation of the prior misconduct). While there may have been surprise, fright and confusion at the Hoffert garage, none of this carried over into the police's encounter with Hogan. This is critical to keep in mind because the factors are used to help determine if the police exploited one event (the official misconduct under this factor) to achieve a second event (the voluntary consent). Here, the flagrancy of the police misconduct is not a factor to support exploitation because it was not further used by police to obtain the consent, nor did it otherwise influence Hogan in any way to give her consent. Thus, this is not a case where in "design and execution" the police had gone fishing for evidence or for the consent of Hogan.

#### d. Additional Factors.

Consideration of the unique facts of this case as applied to the *Brown* factors convinces us to conclude that Hogan's consent was not obtained through exploitation. Additional factors and considerations also support this conclusion.

In his treatise, LaFave states that despite an initial illegal search, if the police *do not* find incriminating evidence against the person who subsequently consented to the second search, "the illegality of the first search will not necessarily invalidate the consent given by one who knows that the police do not claim any authority to continue the search without consent." LaFave § 8.2(d), at 86. In this case, the officers did not find any incriminating evidence against Hogan in their illegal search of the Hoffert garage. Moreover, the credible testimony reveals that Hogan had no reason to believe the police could search Lane's residence without her consent. This is not, therefore, a case where the illegality of the first search should necessarily invalidate Hogan's consent.

In addition, LaFave has observed how a consent search at a location different from the initial illegality impacts the outcome of the exploitation test:

> If the purported consent is to search a place different than that previously subjected to an illegal search, then it is much more difficult to support the assertion that the consent was a surrender to an implied claim of authority; police activity in searching place *A* may fairly be said to be a manifestation of authority to search place *A* but not place *B*. But it is at this point that the *Wong Sun* exploitation test takes on an importance as an alternative ground [in addition to the voluntariness ground] for invalidating the consent. If, for example, the prior illegal search provides a *significant lead* in terms of indicating what other evidence they ought to seek, or where they ought to seek it, or if the illegal search provided the *means of gaining access* to the person from whom the consent was obtained, then a consent obtained by exploitation of that information would constitute fruit of the earlier illegal search.

LaFave § 8.2(d), at 88 (emphasis added). Thus, LaFave agrees that a consent case involving a different location from the illegal search often works against exploitation because it undercuts any claim the subsequent consent search was a manifestation of the initial illegal search. Yet, LaFave emphasizes the added circumstance of a different location is not dispositive. Instead, the exploitation test, and the accompanying factors, are still utilized to determine if the illegal search at the first location gave police a significant lead as to *what other evidence* they should look for at the second location, *where to find* other evidence in the second location, or a *means to gain access* to someone who could consent to a search of the second location.

The discussion of the exploitation test by LaFave in the context of a different location case summarizes much of our prior discussion of the *Brown* factors. Moreover, it provides additional clarity to resolving cases involving a different location, and confirms our analysis in this case. Here, the illegal search of the garage only provided police with information that Lane either possessed or was packaging methamphetamine in Hoffert's garage. Police did not acquire any identifiable leads from this discovery that directed them to what other evidence they should look for in another location, where other evidence would be found in another location, or how they could gain access to the person who ultimately consented to the search of the other location. In other words, there was nothing about the incriminating evidence illegally discovered in the garage that directed police to Lane's residence or to Hogan. At best, the discovery by police only gave them the vague notion that Lane could have additional drugs or other incriminating evidence in his residence located in the vicinity. However, this type of police conjecture, suspicion, and speculation, derived from the

illegal search, is too tenuous to connect the consent with the unlawful entry under the exploitation test. If it was sufficient, there would be no point of utilizing the factors we have identified to determine the result. Consequently, the exploitation test would have no meaning or purpose because the discovery of an illegal act or evidence in one location could always be tied in a vague sense to the suspicion of some illegal act or evidence in another location. Similarly, a connection between the illegal entry and the subsequent consent is not established because police happened to observe Hogan driving a vehicle to Lane's residence while they were standing outside of the garage following the illegal entry. The incriminating evidence acquired from the illegal entry gave no clue as to Hogan's impending arrival at the residence or as to the manner police could conduct a search of the apartment.

At this point it is important to remember that "[e]xclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." *Hudson*, ___ U.S. at ___, 126 S. Ct. at 2160, 165 L. Ed. 2d at 61. We freely acknowledge the police in this case would not have approached Hogan and asked for her consent to search her house if they had not first entered Hoffert's garage and illegally arrested Lane. However, this type of "but-for" analysis is not enough to establish exploitation of the illegal activity. *See id.* at ___, 126 S. Ct. at 2164, 165 L. Ed. 2d at 64-66 ("Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression.").

We also observe that our analysis of the attenuation doctrine does not serve to resurrect the good faith exception by its consideration of the purpose and flagrancy of the police conduct. *See United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) (establishing the good

faith exception in federal courts); *State v. Cline,* 617 N.W.2d 277, 292–93 (Iowa 2000) ("[W]e hold that the good faith exception is incompatible with the Iowa Constitution."), *disavowed on other grounds, Turner,* 630 N.W.2d at 606 n.2. The good faith exception addresses the circumstances where police rely in good faith on an invalid warrant, *see Leon,* 468 U.S. at 926, 104 S. Ct. at 3422, 82 L. Ed. 2d at 701 (modifying the exclusionary rule to include the good faith exception so that evidence seized pursuant to an invalid warrant may still be admissible), or unconstitutional statute, *see Illinois v. Krull,* 480 U.S. 340, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987) (admitting evidence seized from a warrantless search made legal by statute because, even though the statute was unconstitutional, the police acted in good faith), as a means to avoid the application of the exclusionary rule. An exploitation analysis, on the other hand, deals with the dissimilar situation of looking at the connection between the illegality and the subsequent evidence or consent, as a means to determine if the exclusionary rule should apply to the latter event. Flagrant and purposeful police misconduct is examined only because it tends to support exploitation, while the absence of flagrant and purposeful misconduct tends to support attenuation. Thus, good faith by police does not transform the attenuation doctrine into a good faith exception. The purpose of the police conduct is examined only as it relates to the impact of the conduct on the subsequent collection of evidence or the subsequent consent to search.

We recognize the purpose and flagrancy of police conduct, under the attenuation doctrine, is considered the most important factor because it is most closely tied to the purpose of the exclusionary rule—deterring police misconduct. *See Simpson,* 439 F.3d at 496. Yet, this observation does not imply that any rule admitting evidence by consideration of the good faith of

the police is a good faith exception. We did not reject the good faith exception to the exclusionary rule because we rejected the notion that exclusionary rules should deter police misconduct, *cf. Monteleone*, 123 P.3d at 783 (finding exploitation and noting that policy supported their conclusion because "[t]he objective of the exclusionary rule in New Mexico is not to deter police misconduct but to 'effectuate in the pending case the constitutional right of the accused to be free from unreasonable search and seizure'" (quoting *State v. Gutierrez*, 863 P.2d 1052, 1067 (1993))), but because the good faith exception did not also vindicate the other purposes of the exclusionary rule: to provide a remedy for a constitutional violation and to protect the integrity of the judiciary, *see Cline*, 617 N.W.2d at 289. Consequently, and in contrast to the good faith exception, the attenuation limitation does not fail to provide a remedy for the defendant, or injure the integrity of the judiciary. A defendant is not entitled to a remedy when attenuation is found, not because the officers acted in good faith, but because sufficient attenuation exists that demonstrates the evidence used against him was not an exploitation of any violation of his constitutional rights. Thus, Lane's remedy for the constitutional violation that occurred was already provided by the district court with the exclusion of the evidence seized at the Hoffert garage. For the same reason our application of the attenuation limitation does not injure the integrity of the judiciary. In this case, where there is sufficient attenuation, we are not condoning a constitutional violation. Instead, we are recognizing the violation has nothing to do (other than but-for causation) with the consent and subsequent evidence seized.

In conclusion, we find Hogan's consent and the evidence seized as a result was not an exploitation of the prior illegal entry into Hoffert's garage

and the illegal arrest of Lane. Instead, there was sufficient attenuation between the events. In addition, Hogan's consent was voluntary. Thus, although the district court used an incomplete analysis, we affirm its decision to deny the defendant's motion to suppress.

## IV. Ineffective Assistance of Counsel.

### A. Standard of Review.

On appeal Lane alleges he received ineffective assistance of counsel because his attorney failed to challenge the constitutionality of Iowa Code section 901.10(2). As such, "we review de novo the totality of relevant circumstances." *State v. Risdal*, 404 N.W.2d 130, 131 (Iowa 1987). It is of no consequence that this issue was not raised in district court, because "[a]n ineffective-assistance-of-counsel claim falls within an exception to the general rule that a party must preserve error in the district court." *State v. Doggett*, 687 N.W.2d 97, 100 (Iowa 2004). In addition, these claims are normally preserved for postconviction relief, but "we will consider the merits of such a claim on direct appeal if the record is adequate." *Id.* The record is adequate in this case.

### B. Applicable Law.

The legal standards by which we measure claims of ineffective assistance of counsel are well established. To prove ineffective assistance of counsel, the appellant must show that (1) counsel failed to perform an essential duty, and (2) prejudice resulted. *See State v. Simmons*, 714 N.W.2d 264, 276 (Iowa 2006); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984). Whether counsel failed to perform an essential duty is "measured against the standard of a reasonably competent practitioner with the presumption that the attorney performed his duties in a competent manner." *Doggett*, 687 N.W.2d at 100.

Whether prejudice resulted depends on finding "a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Hopkins*, 576 N.W.2d 374, 378 (Iowa 1998).

### 1. Failure to Perform an Essential Duty.

We squarely addressed this issue last year. *See Simmons*, 714 N.W.2d at 268–69. In *Simmons* the appellant argued his trial counsel had a duty to challenge Iowa Code section 901.10(2) under equal protection standards. *Id.* at 276. Previously, in *State v. Biddle*, 652 N.W.2d 191, 203 (Iowa 2002), we held section 901.10(2) did not violate equal protection under a rational basis test, and specifically preserved for postconviction relief proceedings the question of its constitutionality under strict scrutiny. In *Simmons*, we held section 901.10(2) did not violate equal protection under strict scrutiny. 714 N.W.2d at 278. As a result, we denied the appellant's claim of ineffective assistance of counsel because it could not be shown his trial counsel failed to perform an essential duty, *i.e.*, challenge section 901.10(2). *Id.* That is because section 901.10(2) is constitutional under a strict scrutiny equal protection analysis. *See id.* Thus, Lane's claim in the present case must also fail for neglecting to show his trial counsel failed to perform an essential duty, and we need not address whether prejudice resulted.

### V. Conclusion.

We find in favor of the appellee on both issues. Although using an incomplete analysis, the district court properly denied the appellant's motion to suppress because Hogan's consent was both voluntary and not an exploitation of the prior illegality. In addition, the appellant was not

denied effective assistance of counsel at trial because section 901.10(2) is constitutional.  Therefore, we affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except, Larson, J., who concurs specially, Ternus, C.J. and Wiggins, J., who dissent separately, and Hecht and Appel, JJ., who take no part.

**LARSON, Justice (concurring specially).**

I concur in the result reached by the plurality opinion. However, I write separately to express my view that both the plurality and dissent rely too much on their analyses of *Wong Sun* and the fruit-of-the-poisonous-tree doctrine. Even if it is conceded that the initial search of Lane in the garage was illegal, this is not a case in which the police used the fruits of that search to obtain evidence from Lane's apartment.

A search based on consent by Lane's *cotenant* was a large step removed from the garage search. In fact, they were unrelated. It is no doubt true that the officers' interest in Lane was aroused by what they had seen in the garage and the independent information they had received the same day about Lane's involvement as a large drug dealer. The officers pursued the matter, but not with Lane; they did not attempt to use the information obtained in the garage search to obtain a search warrant. That clearly would constitute fruit of the earlier illegal search. They pursued their investigation by going to a totally independent source—a search based on consent. The significant point is that consent was not obtained from Lane—a scenario that might raise fruit-of-the-poisonous-tree concerns—but consent of a third party, Lane's cotenant.

Our cases have clearly established that consent validly obtained—even consent from the defendant himself—may cure any Fourth Amendment problem inherent in an earlier search. In *State v. Howard,* 509 N.W.2d 764 (Iowa 1993), an initial search was held to be invalid on the basis the officer had improperly promised leniency. Nevertheless, a later search based on consent by the defendant and his girlfriend vitiated any

Fourth Amendment problems. *Id.* at 767 ("Even if an initial search is invalid, a later search based on written consent is valid."); *State v. Garcia*, 461 N.W.2d 460, 464 (Iowa 1990), *cert. denied*, 499 U.S. 909 (1991) ("Even if it were assumed that the initial stop was invalid and the search therefore improper, the later search based on the written consent by Garcia was valid.").

Here, a stronger case is made for admission of the evidence than in either *Howard* or *Garcia*. In those cases, the consent was obtained from the defendants themselves, and an argument might be made that they felt compelled to later consent to the search. Here, it is not a question of attenuation by passage of time or change of circumstances that might validate a later search. Here, the search was independently based on consent of another person, a person Lane does not even argue lacked standing to give consent.

I agree with the majority's conclusion that Hogan's consent was validly obtained. I would affirm the judgment of the district court on that narrow ground alone.

**TERNUS, Chief Justice (dissenting).**

I respectfully dissent. I believe the drugs found in Lane's apartment must be suppressed under the fruit-of-the-poisonous-tree doctrine. Contrary to the conclusion of the plurality, the prior illegal entry into and search of the garage "provide[d] a significant lead in terms of indicating what other evidence [the police] ought to seek [and] where they ought to seek it." 4 Wayne R. LaFave, *Search and Seizure* § 8.2(d), at 88 (4th ed. 2004). A common sense analysis of the facts inevitably leads to the conclusion that law enforcement authorities used information they obtained in the illegal garage search to focus their attention on Lane's residence in an effort to discover additional illegal substances. The trial court erred in overruling the defendant's motion to suppress. Accordingly, I would reverse the defendant's conviction and remand for a new trial.

**WIGGINS, Justice (dissenting).**

I respectfully dissent. Although I agree Hogan's consent to search the residence was voluntary, I disagree with the conclusion that the seizure of the drugs at Lane's residence was not an exploitation of the prior illegal entry and search of the garage.

To reach its decision, the plurality opinion modifies the fruit-of-the-poisonous-tree doctrine finding the evidence obtained by an exploitation of a prior illegality as the "practical equivalent" to the consent given to obtain this evidence. In describing its own analysis, the plurality states, "this approach is technically inconsistent with the principle announced in *Wong Sun.*" The plurality's claim that the fruit-of-the-poisonous-tree doctrine is "technically inconsistent" with the doctrine as announced in *Wong Sun* is equivalent to saying a woman is only a little pregnant. The opinion's approach is not only inconsistent with the holding in *Wong Sun,* it is also illogical and irrational.

As the plurality recognizes, the law requires that the consent not only be voluntary, but also that the State establish a break in the illegal action and the subsequently obtained evidence. *State v. Reinier*, 628 N.W.2d 460, 468 n.3 (Iowa 2001). However, the plurality's analysis always will lead to the conclusion that a voluntary consent from a party not present at the prior illegality establishes a break in the illegal action and the subsequently obtained evidence.

My de novo review of the record reveals the taint of the illegality had not dissipated when the officers obtained the evidence at the residence. In determining whether evidence obtained is admissible following an illegal search and seizure, we consider (1) the temporal proximity of the illegal

police action and the discovery of the evidence, (2) the presence of intervening circumstances, "and, particularly, [(3)] the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 2261-62, 45 L. Ed. 2d 416, 427 (1975). The burden to prove the evidence is admissible rests on the State. *Id.* at 604, 95 S. Ct. at 2262, 45 L. Ed. 2d at 427.

Applying the first factor, I find there was no significant time lapse between when the officers entered and searched the garage and when the officers approached Hogan, obtained her consent to search the residence, and discovered the drugs.

As to the second factor, the State does not point to any pertinent circumstance that intervened between the time of the entry and search of the garage and the search of the residence. Although the State argues the officers had prior information that Lane sold drugs, the officers had not obtained any new information regarding Lane's drug dealings between the time of the illegal entry and search of the garage and the time they searched Lane's residence. Thus, this information cannot be an intervening circumstance. Additionally, officer Oster testified "[he] wouldn't even have been [at Lane's residence] had [he] not made the arrest in the garage earlier on her boyfriend." This testimony is similar to the testimony in *Wong Sun* that caused the Supreme Court to suppress the admission of the heroin voluntarily given to the authorities by a person not present at the prior illegal entry and arrest as an exploitation of that prior illegality. *See Wong Sun v. United States*, 371 U.S. 471, 487, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441, 455 (1963) (holding the exclusionary rule required the suppression of the narcotics voluntarily given to the authorities by a person not present at the prior illegality based on "[t]he prosecutor candidly [telling] the trial court

that 'we wouldn't have found those drugs except that [the statements suppressed by the Court due to an illegal entry and arrest] helped us to' " find the narcotics).

As to the third factor, the officer's entry and search of the garage was a flagrant violation of Lane's rights. Lane testified he asked Oster if he had a warrant to be in the garage. Oster responded they were chasing Hammer. Oster also asked Lane if he just graduated from law school. Lane replied by saying no, he had not graduated from law school. Oster then grabbed his badge and said it gave him the right to do anything he wanted. Neither of the officers refuted this testimony.

After analyzing these same factors, the plurality opinion states:

> Police did not acquire any identifiable leads from this discovery that directed them to what other evidence they should look for in another location, where other evidence would be found in another location, or how they could gain access to the person who ultimately consented to the search of the other location. In other words, there was nothing about the incriminating evidence illegally discovered in the garage that directed police to Lane's residence or to Hogan.

These statements are not only naive, but also are contrary to the record. The police did not intend to search Lane's residence or any other residence in the neighborhood on this day. The officers believed they might find drugs in Lane's residence because they found drugs on Lane in the garage. Oster confirmed the reason they searched Lane's residence was because of the items they found on Lane in the garage. To say there was even a tenuous connection between the illegal search of the garage and the consensual search of the residence completely ignores the record made below.

Although the police had prior information regarding Lane's drug dealing, the record does not state how they received this information or

whether this information would support the issuance of a search warrant by a magistrate. The police should have known they would have been unable to obtain a search warrant based on the information obtained by the illegal entry and search of the garage. *See State v. Naujoks*, 637 N.W.2d 101, 112 (Iowa 2001) (stating information obtained after an illegal entry is tainted evidence and may not form the basis of probable cause to issue a search warrant); *State v. Ahart*, 324 N.W.2d 317, 318 (Iowa 1982) (stating information obtained on a prior unlawful search cannot be the basis for the issuance of a search warrant); *State v. Swartz*, 244 N.W.2d 553, 555 (Iowa 1976) (stating information obtained from the execution of a search warrant issued without probable cause cannot be used to obtain a second search warrant).

Had Hogan not returned home when she did, the officers would have been required to apply for a search warrant to search Lane's residence. No judicial officer should have granted the officer's request for a warrant because the only basis for the warrant would have been the information the officers gained in the illegal entry and search of the garage. And, if a warrant had been granted, any evidence obtained pursuant to the warrant would have been suppressed because that warrant would have been based on the information the officers gained in the illegal entry and search of the garage. As the district court noted in its ruling:

> The Defendant urges that the improper entry into the garage invalidates the subsequent consent and search of the Lane residence, as the officers' motivation for seeking consent was based on their knowledge gained from the illegal entry into the garage. The Defendant is correct in his assertion that if the officers had relied upon their observations in the garage in seeking a warrant for the Lane residence, those allegations in their affidavits would have to be excised in determining whether the warrant was based on probable cause. Similarly, those observations would play no part in a determination of

whether an involuntary warrantless search of the Lane residence was permissible.

For the plurality to hold the consent is not an exploitation of the illegal entry and search of the garage when the use of the same information to obtain a search warrant would have been an exploitation of the illegal entry and search leads to an absurd result in this case.

Furthermore, the plurality rule allowing the police to use the fruits of their prior illegal action to obtain a voluntary consent to search Lane's residence would only ratify the officers' illegal conduct. Professor LaFave illustrates this point in the quote relied on by the plurality:

> If the purported consent is to search a place different than that previously subjected to an illegal search, then it is much more difficult to support the assertion that the consent was a surrender to an implied claim of authority; police activity in searching place *A* may fairly be said to be a manifestation of authority to search place *A* but not place *B*. *But it is at this point that the . . . exploitation test takes on importance as an alternative ground for invalidating the consent. If, for example, the prior illegal search provides a significant lead in terms of indicating what other evidence they ought to seek or where they ought to seek it, or if the illegal search provided the means of gaining access to the person from whom the consent was obtained, then a consent obtained by exploitation of that information would constitute a fruit of the earlier illegal search. This would be true, as noted earlier, even if the consenting party were unaware of the earlier search.*

4 Wayne R. LaFave, *Search and Seizure* § 8.2(d), at 88 (4th ed. 2004) (footnotes omitted) (emphasis added).

Oster's confirmation that he would not have asked Hogan for permission to search the residence had the officers not found the items on Lane in the garage, confirms the prior illegal search provided a significant lead in terms of indicating what other evidence the police ought to seek and where they ought to seek it. I agree if the police had asked Hogan for her consent without the prior illegality, the search would have been constitutional. However, we should not ratify the prior illegal entry and

search of the garage by allowing it to be the basis of obtaining Hogan's consent. Such ratification would remove the incentive for the police to respect an individual's constitutional guarantees, prevent a person whose rights are violated from having a bona fide remedy for the violation, and undermine the integrity of the judiciary because the court would be ignoring a clear violation of the Constitution. *See State v. Poaipuni*, 49 P.3d 353, 359-60 (Haw. 2002) (holding father's voluntary consent to search tool shed was the result of exploitation by the police of an unlawful search warrant, thereby rendering the firearms seized in the shed "tainted fruit of the poisonous tree").

Accordingly, I would exclude the evidence found at Lane's residence, reverse the defendant's conviction, and remand the case for a new trial.