# IN THE COURT OF APPEALS OF IOWA

No. 15-2225
Filed February 8, 2017

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**BOUNMY BOUNMY,**
      Defendant-Appellant.
_____


Appeal from the Iowa District Court for Plymouth County, Gary E. Wenell (trial and sentencing) and Jeffrey L. Poulson (motion to suppress), Judges.


A defendant challenges the traffic stop leading to her convictions for possession of a controlled substance and failure to affix a drug tax stamp. **REVERSED AND REMANDED.**


Rees C. Douglas, Sioux City, for appellant.

Thomas J. Miller, Attorney General, and Elisabeth S. Reynoldson, Assistant Attorney General, for appellee.


Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

Bounmy Bounmy appeals her convictions for possession of methamphetamine and failure to affix a drug tax stamp. She disputes the district court's denial of her motion to suppress on four grounds: (1) the traffic stop lacked probable cause, (2) the stop was impermissibly pretextual, (3) the deputy unlawfully expanded the scope of the stop, and (4) the deputy did not obtain valid consent for the additional investigation. From our de novo review, we conclude the State did not meet its burden of showing individualized suspicion to justify prolonging the stop beyond its traffic-related mission—either to ask additional questions or to "escort" the passenger to the patrol car before conducting a dog sniff. Because the outcome here is controlled by *In re Pardee*, 872 N.W.2d 384, 391 (Iowa 2015),[1] we reverse the denial of Bounmy's motion to suppress and remand for further proceedings.

## I.      Facts and Prior Proceedings

In the early hours of April 21, 2015, Deputy Sheriff Matt Struve received a phone call from fellow Plymouth County Deputy Scott Dorhout, who had fielded a request from an O'Brien County deputy to keep a lookout for a vehicle travelling southbound toward Sioux City. The car was "coming from a known drug house" in O'Brien County, according to the lookout request. Deputy Struve, who was part of the K-9 unit, joined Deputy Dorhout at an interchange on Highway 60/75 so the two could watch for that car and relay any information they acquired about its occupants to the O'Brien County Sheriff's Office.

---

[1] The district court issued its suppression rulings in June 2015. Our supreme court did not issue its opinion in *Pardee* until December 11, 2015. Accordingly, the district court did not have the benefit of reading *Pardee* when analyzing the suppression motion.

Eventually, the deputies spotted a tan Honda Accord, which they believed fit the description[2] from O'Brien County, and began to follow it. At first, the Accord was travelling well below the posted common speed limit—fifty-five miles per hour in a sixty-five-mile-per-hour zone. But when the Accord passed through Hinton, the deputies determined the driver was speeding. Deputy Struve explained:

> [T]he speed limit drops to [fifty-five], [forty-five], [thirty-five]. In the [forty-five] mile per hour zone, I observed the vehicle going [forty-five] miles per hour. In the [thirty-five] mile per hour zone, I observed the vehicle[] going about [thirty-nine] miles per hour and then dropped down to [thirty-eight] miles per hour. At that time I proceeded to stop the vehicle.

As Deputy Struve approached the car, he saw a male driver, a male passenger in the front seat, and a female passenger in the back seat. He requested the driver's license, vehicle registration, and proof of insurance, which the driver provided after Bounmy, who was the backseat passenger, told the driver where the documents were kept.

The deputy then took the driver back to the patrol car to write a warning for the speeding violation and to ask questions of the driver, a practice the deputy routinely employed when conducting a traffic stop. Deputy Struve also ran a check on the vehicle's registration and a check for outstanding warrants on the driver. In response to Deputy Struve's questions, the driver said he and the passengers had left Sioux City for a hospital "in the Spencer area" around midnight and were headed back to Sioux City, taking the same route home. But the driver didn't know the name of the person they had been visiting or "exactly

---

[2] Our record does not disclose how detailed a vehicle description the Plymouth County deputies received from O'Brien County.

where the hospital was." Nor did the driver know the last name of the passenger sitting next to him in the Accord. During their conversation, Deputy Struve noticed the driver had some difficulty speaking English, but he believed the driver was generally able to understand.[3]

After Deputy Struve and the driver returned to the Accord, the deputy had a conversation with Bounmy. He did so because sometimes the passengers in a vehicle will give "inconsistent stories." Deputy Struve found Bounmy's story varied slightly from what the driver had told him. Bounmy estimated they left Sioux City around 10:30 that night, she said they visited locations in addition to the Spencer hospital, and she described getting lost in Sanborn, a town in O'Brien County, on their way home. Bounmy told Deputy Struve they were travelling back home that night because the driver worked in the morning, but when the deputy asked her what time he had to work, she said he didn't work until the afternoon.

Around this time, Deputy Struve issued a speed warning to the driver and told him he was free to leave. But then the deputy asked if the driver "would mind sticking around for a few additional questions." Apparently misunderstanding Deputy Struve's question, the driver responded he didn't have any additional questions. Deputy Struve clarified: "No, no. I have some questions for you. Would you mind sticking around and answering a few more questions?" According to the deputy, the driver told him he understood and agreed to continue speaking to him.[4]

---

[3] The record shows the driver and Bounmy are native Laotian speakers.
[4] The driver did not testify at the suppression hearing or at trial.

At the suppression hearing, Deputy Struve synthesized his suspicions developed during the traffic stop:

A. I was suspicious there was criminal activity due to the fact that the driver didn't know the passenger's last name. Knew the first name, didn't know the last name. The direction of travel, the times that they had left, nothing was adding up to the times they should have been at the hospital and came back home from the hospital. The time he had to work the next day was actually not in the morning. It was in the afternoon. And there—there was time in there where I could sense some nervousness.

Q. How about the fact that you'd been told by other law enforcement officers this vehicle had just left a drug house? A. And the fact that I'd been notified by O'Brien County.

Q. Any suspicion of a particular controlled substance you thought was involved in this stop? A. At this point I . . . did not know what was involved within the stop.

Deputy Struve directed everyone to exit the Accord so he could conduct a dog sniff for narcotics. According to the deputy, when he asked the driver "if he would mind if I walked my dog around the vehicle," the driver "became very nervous and started kind of stumbling. He couldn't really understand what I was trying to say anymore." Deputy Struve then asked Bounmy to assist in communicating with the driver. When the deputy asked Bounmy—who had been "friendly" and "willing to answer questions" up until that point—if there was anything illegal in the vehicle, "[s]he became nervous" and was "escorted to Deputy Dorhout's car."

As Bounmy was "being escorted," Deputy Struve saw her make "a quick movement . . . out of the corner of my eye. And when I turned around, I noticed that there was a baggie of white crystal-like substance . . . on the ground which I had not seen prior to her being right there." A field test indicated the substance was methamphetamine. When questioned about the baggie, Bounmy initially

denied it was hers, stating "she was an old lady and . . . does not do that."  But moments later she claimed ownership of the methamphetamine.  Then Deputy Struve walked his dog around the Accord, but the dog did not alert.  He searched the car and found a glass pipe in the back where Bounmy had been seated.  Deputy Struve arrested Bounmy.  At the jail, a corrections officer recovered an additional package of methamphetamine from Bounmy's bra.

The State charged Bounmy by trial information with two counts of possession of a controlled substance, in violation of Iowa Code section 124.401(5) (2015), two counts of failure to affix a drug tax stamp while being a habitual felon, in violation of Iowa Code sections 453B.3 and 453B.12, and one count of possession of contraband while being a habitual felon, in violation of Iowa Code section 719.7.  Bounmy filed a motion to suppress the evidence obtained as a result of the traffic stop; the motion alleged the deputy did not obtain consent for a dog sniff.

Following a hearing, the district court overruled Bounmy's motion, reasoning: "[T]he stop was not unreasonable as the driver was speeding.  During the traffic stop, a baggie containing contraband was found next to the defendant, as such there was no search."  In response to Bounmy's motion to enlarge, the court elaborated:

> As the traffic stop was valid, it was not pretextual. . . .
> Deputy Struve testified that after writing a warning, he advised the driver that he was free to go and asked if he would be willing to answer additional questions.  At this point, the driver expressed difficulty understanding English and requested [Bounmy], who was a passenger in the backseat, and who had better English skills, to come to the car to assist him.  In connection with [Bounmy] coming to the patrol car, the illegal drugs were found in plain view.  Under the facts of this case, the officer did not

> unlawfully expand [Bounmy's] seizure for investigation unrelated to the purpose of the stop. . . .
>
> The Court finds that the driver requested [Bounmy's] assistance for purposes of translating the conversation with the officer. The Court finds that this constitutes free and voluntary consent.

The matter proceeded to a bench trial, and the court found Bounmy guilty of one count of possession of a controlled substance and one count of failure to affix a drug tax stamp. Bounmy now appeals.

## II. Scope and Standard of Review

Bounmy argues the district court should have granted her motion to suppress on federal and state constitutional grounds. Accordingly, our review is de novo. *See State v. Baldon*, 829 N.W.2d 785, 789 (Iowa 2013). We independently evaluate the totality of the circumstances as demonstrated by the entire record. *See id.* We consider both the evidence presented at the suppression hearing as well as the evidence presented at trial. *See State v. Carter*, 696 N.W.2d 31, 36 (Iowa 2005). "[W]e give deference to the factual findings of the district court due to its opportunity to evaluate the credibility of the witnesses but are not bound by such findings." *State v. Lane*, 726 N.W.2d 371, 377 (Iowa 2007).

## III. Analysis

### A. Was the traffic stop supported by probable cause?

Citing *State v. Tague*, 676 N.W.2d 197, 203–04 (Iowa 2004), Bounmy argues the "single incident" of speeding observed by Deputy Struve was not sufficient to constitute probable cause for the traffic stop.[5] She contends: "[The]

---

[5] Bounmy does not challenge the accuracy of Deputy Struve's speed determination.

driver was bringing the vehicle's speed down and had previously held the speed down consistently. There were no other concerns about the vehicle or about the driving."

We find Deputy Struve had probable cause to stop the Accord based on the speed violation. Probable cause occurs when the totality of the circumstances as viewed by a reasonable person would lead that person to believe: (1) a crime has been or is being committed and (2) the arrestee committed or is committing it. *Tague*, 676 N.W.2d at 201. "When a peace officer observes a violation of our traffic laws, however minor, the officer has probable cause to stop a motorist." *Id.*; *see also State v. Predka*, 555 N.W.2d 202, 206 (Iowa 1996) (finding officer who observed defendant driving five miles over the speed limit had probable cause to stop).

Bounmy reads *Tague* too broadly. In *Tague*, the court found a driver's "single incident of crossing the edge line [of the road] for a brief moment . . . did not give the police probable cause to stop Tague for a traffic violation under section 321.306." 676 N.W.2d at 204. But this finding was based upon the court's interpretation of Iowa Code section 321.306 (2001), which provided: "A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." *Id.* at 203. The court reasoned a violation of this statute "does not occur unless the driver changes lanes before the driver ascertains that he or she could make such movement with safety" and concluded that because the movement over the line was brief, the roadway was devoid of other traffic, and the officer did not observe the vehicle making any other erratic

movements, the State did not prove Tague violated section 321.306. *See id.* at 203–04.

By contrast, Deputy Struve *did* observe a traffic violation—a vehicle travelling four miles per hour over the speed limit. Under Iowa Code section 321.285(7) (2015), a person who drives at an "excessive speed in violation of a speed limit commits a simple misdemeanor." While section 321.306 allows a driver to move outside of a lane when it is safe to do so, section 321.285(7) provides a driver no comparable discretion to travel above the posted speed limit. Accordingly, the Accord's speed gave Deputy Struve probable cause to initiate a traffic stop.

**B.      Was the traffic stop impermissibly pretextual?**

Bounmy next argues the stop was pretextual. She compares the deputies' subjective reason for following the Accord (possible drug possession) with the articulated reason for the stop (speeding). Bounmy asserts the objective reason is suspect since the vehicle "was decelerating to comply with a speed limit." She acknowledges a pretextual stop is permissible under the Federal Constitution, *see Whren v. United States*, 517 U.S. 806, 812–16 (1996), but, citing authority from Washington and New Mexico, urges us to ban pretextual stops under the Iowa Constitution. The State contends we should continue to adhere to the objective federal approach and argues the alternative forwarded by Bounmy would be fraught with "evidentiary and practical problems."

Recognizing her argument seeks a change in Iowa's approach to pretextual stops, Bounmy asked the supreme court to retain her appeal.[6] But the supreme court transferred the case to us. "We are not at liberty to overturn Iowa Supreme Court precedent." *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990). We are bound by *Kreps*, where the court held the test for traffic stops is objective. 650 N.W.2d at 641; *see also Harrison*, 846 N.W.2d at 366 (majority opinion) (citing *Kreps* with approval).

**C.    Did the deputy impermissibly prolong the stop?**

Having determined Deputy Struve was justified in stopping the Accord based on the driver exceeding the speed limit, we turn to Bounmy's claim that the drug evidence should have been suppressed because the deputy unreasonably prolonged the traffic stop in violation of the Fourth Amendment. We examine the deputy's authority for the continued seizure of passenger Bounmy under the framework set out in *Rodriguez v. United States*, 135 S. Ct. 1609, 1614–16 (2015) and *Pardee*, 872 N.W.2d at 391.

*Rodriguez* holds "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." 135 S. Ct. at 1614 (citation omitted). Beyond deciding whether to issue a citation, an officer

---

[6] At oral argument, Bounmy's counsel asserted the validity of pretextual stops under the Iowa Constitution is an open question. *See State v. Harrison*, 846 N.W.2d 362, 371 (Iowa 2014) (Appel, J., dissenting) ("This issue of whether *Whren* is good law under the Iowa Constitution when a traffic stop is based on pretext, however, was not raised by Harrison and we do not address it today."). Although our supreme court has not specifically considered whether to depart from *Whren* under article I, section 8 of our state constitution, the court has previously applied an objective approach to determine the validity of a traffic stop under the search-and-seizure clauses of both constitutions. *See State v. Kreps*, 650 N.W.2d 636, 640–41 (Iowa 2002) (stating the court "usually deem[s] the two provisions to be identical in scope, import, and purpose").

may make "ordinary inquiries" incident to the traffic stop, including checking the driver's license, determining whether the driver has outstanding warrants, and inspecting the car's registration and proof of insurance. *Id.* at 1615. Unrelated investigations may be tolerated by the Fourth Amendment only if they do not lengthen the roadside detention. *Id.* at 1614. The *Rodriguez* court decided a dog sniff was not an ordinary inquiry related to the purpose of the traffic stop but, rather, was a measure aimed at detecting criminal wrongdoing outside the traffic stop's mission. *Id.* at 1615. In considering the propriety of a dog sniff, the court opined an officer may not extend an otherwise completed traffic stop without independent reasonable suspicion. *Id.* at 1615–16.

Applying *Rodriguez*, our supreme court found a roadside dog sniff impermissible when the state trooper "developed reasonable suspicion of other criminal activity—if at all—only by prolonging the initial stop beyond the time reasonably necessary to execute the traffic violation warnings." *Pardee*, 872 N.W.2d at 391. In that case, the State argued the nervousness and "somewhat inconsistent travel plans" expressed by passenger Pardee and the car's driver justified their continued detention by the trooper. *Id.* at 393. The *Pardee* majority rejected the State's argument, concluding the trooper's "blending" of questions about the traffic stop with unrelated drug-interdiction inquiries impermissibly prolonged the stop. *Id.* at 396–97.

Bounmy compares her situation to *Rodriguez* and *Pardee*, contending Deputy Struve unlawfully extended the speeding stop by questioning her and the driver concerning where they had been earlier that night and where they were

going that morning—inquiries unrelated to the mission of the stop for speeding.

On appeal, Bounmy asserts:

> It is abundantly clear that without questions that prolonged the stop past the point where he issued the warning citation Deputy Struve did not have grounds for reasonable suspicion to support a dog sniff, search of the car, or detention of the passengers. It was this detention that led to Ms. Bounmy's arrest, because without the detention she would have been on her way.

In response, the State asserts Deputy Struve had reasonable suspicion to engage the driver in conversation because the Plymouth County deputies received information the vehicle had "just left" a residence known to be involved in the use or distribution of controlled substances.[7] If the information concerning the Accord's association with the O'Brien County "drug house" did not amount to reasonable suspicion to initiate an investigatory stop, that same information—unenhanced by the deputies' observations[8] during his interaction with the

---

[7] But the State does not argue Deputy Struve had independent reasonable suspicion of a drug-related offense to justify the traffic stop itself. Indeed, the record would not support such an argument. The deputy testified only that the suspect vehicle was coming from a "known drug house" that had been under surveillance and was travelling toward Sioux City. The deputy did not explain how long the house had been under surveillance and did not know the identity of the primary investigators. Other jurisdictions have determined that presence at a drug house—standing alone—is insufficient to support reasonable suspicion. *See, e.g.*, *United States v. Spears*, 636 Fed. App'x 893, 899 (5th Cir. 2016) (comparing visiting a house linked to drug activity to leaving a high-crime area); *State v. Hopper*, 666 S.E.2d 735, 737 (Ga. Ct. App. 2008) (finding stop not supported by reasonable suspicion where defendant "went into a suspected drug house in the middle of the afternoon, stayed for a few minutes, and then he left and drove away"); *State v. Rutledge*, 260 P.3d 532, 536 (Or. Ct. App. 2011) (finding officer had no reasonable suspicion to seize passenger who "had just left a motel that the police believed was involved in drug activity, was in a car with a person suspected of drug activity, and acted nervously"); *see also Utah v. Strieff*, 136 S. Ct. 2056, 2062 (2016) (assuming without deciding, because it was conceded by the State, officer lacked reasonable suspicion to initially stop defendant after he had left suspected drug house).

[8] Our court recently held the observations by an officer trained in drug recognition that the driver's pupils were dilated, indicating she was driving under the influence, gave him reasonable suspicion to expand a traffic stop. *State v. Snow*, No. 15-0929, 2016 WL 4801353, at *3 (Iowa Ct. App. Sept. 14, 2016).

driver—cannot form reasonable suspicion to prolong the traffic stop beyond the purpose of issuing the speed warning. *See Pardee*, 872 N.W.2d at 393–95 (declining to find trooper developed reasonable suspicion of criminal activity during roadside encounter with a passenger and driver based on nervousness, lived-in look of car, and odor of air freshener).

In addition to the drug-house connection, the State cites the vagueness of the driver's description of their itinerary, the inconsistencies between his description and Bounmy's version of the trip, and the "unusual" demeanor of both the driver and Bounmy—as noted by Deputy Struve. But the State also recognizes "in *Pardee,* the Iowa Supreme Court found similar factors to be insufficient to create reasonable suspicion." *See id.* at 395–97*.* The State submits the *Pardee* majority "wrongly analyzed the reasonable suspicion issue" and lobbies for adoption of "the dissenting opinion in that case." *See id.* at 397–99 (Cady, J., dissenting).

Because the supreme court transferred this case to our court, the *Pardee* majority opinion is binding precedent. Under *Pardee*, the authority for seizing Bounmy (as well as the driver) ended "when tasks tied to the traffic infraction" were—or reasonably should have been—completed. *See id.* at 392 (majority opinion) (quoting *Rodriguez*, 135 S. Ct. at 1614). The tasks tied to the speeding violation included those "ordinary inquiries" conducted by Deputy Struve, including running the driver's license and registration and checking for warrants. By contrast, the deputy's interviews with the driver and Bounmy to compare their travel plans were linked to the drug interdiction and not the speed warning. As was the case in *Pardee*, the deputy could have completed the process of warning

the driver about his speed without the separate investigative questioning. *See id.* at 396. By engaging in that questioning, Deputy Struve prolonged the traffic stop.[9]

The next question under *Pardee* is whether individualized suspicion would have existed to "escort" Bounmy from the Accord before undertaking the dog sniff without the delay created by the deputy's questioning of the driver and Bounmy that was unrelated to the speed warning. *Id.* at 396–97. The deputy's suspicions were raised because the driver could not recollect exactly where he had been, who he had been visiting at the hospital, or his passenger's last name. The deputy also felt the driver was "flustered" at times.[10] In addition to the driver's answers, the deputy was armed with the information from O'Brien County that a similar vehicle had been seen leaving a "known drug house."

The facts developed during the deputy's routine questioning of the driver did not lead to reasonable suspicion that the driver or passengers were committing a drug-related offense. Subjectively, Deputy Struve could not articulate particularized suspicion at that juncture in the traffic stop. At the suppression hearing, the prosecutor asked the deputy how he assessed the situation after filling out the speed warning and deciding to question Bounmy:

> Q. So what was the . . . suspicion you had at that point?
> A. Suspicion I had when I talked to Ms. Bounmy?

---

[9] It is unclear whether the deputy actually issued the warning after filling it out while speaking to the driver or if he waited until after speaking with Bounmy. Because the deputy should have concluded the traffic stop after writing the warning in his patrol car, we consider that point—before he interviewed Bounmy—to be the end of the traffic-related portion of the stop. *See Rodriguez*, 135 S. Ct. at 1614.

[10] The driver's nervousness is of limited significance. *See Pardee*, 872 N.W.2d at 394.

Q. When you go back to the vehicle to talk to Ms. Bounmy.
A. This is just something I usually conduct. I try to have a conversation with everybody in the vehicle.

We conclude the deputy's basis for believing Bounmy and the driver were involved in other criminal activity before Bounmy was "escorted" toward the patrol car—viewed objectively—did not rise to the level of reasonable suspicion, which is probably why Deputy Struve told the driver they were free to leave even after posing questions unrelated to the mission of the stop. *See id.* at 394 ("On the whole, one can fairly say the grounds for suspecting Saccento and Pardee of other criminal activity before they were detained for the dog sniff were not *that* strong. That probably explains why Trooper Vander Weil said they were free to go."). Accordingly, we reach the same result as the majority did in *Pardee*. Because Deputy Struve lacked reasonable suspicion to prolong the traffic stop, we find the evidence he obtained as a result of Bounmy's continued detention should have been suppressed.[11]

**D.  Did the driver consent to the deputy's additional investigation?**

In addressing Bounmy's motion to enlarge the suppression ruling, the district court decided the driver gave voluntary consent to additional questions from the deputy after being told he was free to go, justifying Bounmy's continued

---

[11] The district court decided in its original suppression ruling that the methamphetamine discarded on the ground by Bounmy was not found as the result of a search. But the State does not argue abandonment or plain view as grounds for upholding the ruling on appeal. Accordingly, we do not consider those warrant exceptions in our analysis. Even if they had been argued, we believe the constitutional violation occurred at the moment the deputy prolonged the traffic stop beyond its permissible length. Accordingly, the information and evidence the deputy obtained while Bounmy was illegally detained is inadmissible. *See Pardee*, 872 N.W.2d at 397 (finding information obtained after the permissible end of the traffic stop could not be used to support reasonable suspicion); *cf. State v. McGrane*, 733 N.W.2d 671, 680 (Iowa 2007) ("For the plain view exception to apply, police must be rightfully in the place that allows them to make the observation." (citation omitted)).

detention. The State bears the burden of showing consent was freely and voluntarily given under the totality of circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *see also State v. Lane*, 726 N.W.2d at 378 (describing two-part test for determining validity of consent: voluntariness *and* lack of exploitation of the prior illegality under the fruit-of-the-poisonous-tree doctrine). A traffic stop on a public road is an "inherently coercive" setting, making it more "likely that a citizen would not feel free to decline to give consent." *See State v. Pals*, 805 N.W.2d 767, 783 (Iowa 2011).

The interplay between impermissibly prolonging a traffic stop and seeking consent to conduct further investigation (either by additional interrogation or a dog sniff) was not fully explored in *Rodriguez* or *Pardee*. In *Rodriguez*, the driver refused consent for the dog sniff at issue. 135 S. Ct. at 1613. In *Pardee*, the trooper told the driver he was free to go, and then asked if he would consent to answering more questions, which the driver did. 872 N.W.2d at 388. But the driver in *Pardee* did not agree to wait for the narcotics dog because "he wanted to get going." *Id.* The trooper then detained the car's occupants and conducted the dog sniff without the driver's consent. *Id.* Despite the driver's consent to answer more questions, the *Pardee* majority found the trooper could not rely on those answers, or information obtained earlier during the unnecessary expansion of the stop, to establish reasonable suspicion for the dog sniff. *Id.* at 397.

On appeal, Bounmy argues her continued detention that led to the discovery of the drugs was not supported by valid consent. Bounmy points to language and cultural barriers preventing the State from meeting its burden to show the driver voluntarily agreed to answer questions from the deputy not

related to the traffic stop. Bounmy also asserts Deputy Struve admitted he did not receive permission to conduct the dog sniff.

The State contends the record does not support Bounmey's assertion that limited English skills or cultural misperceptions by Bounmy or the driver prohibited a finding of consent. The State argues the totality of the circumstances show the deputy's encounter with the driver was not coercive.[12]

We need not settle the parties' debate concerning the voluntariness of the driver's consent to additional questioning. When the deputy told the driver he was free to go and then asked permission to make more inquiries, the stop had already been impermissibly prolonged by the deputy's quizzing of both the driver and Bounmy on the topic of their travel plans—a line of questioning unrelated to issuing the speed warning. The driver and Bounmy had already been subjected to illegal detention in violation of the Fourth Amendment.

Consequently, any consent given by the driver to extend the length of the traffic stop was tainted by the prior illegal detention. *See Lane*, 726 N.W.2d at 378 (clarifying that evidence obtained by purported consent should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality). Under *Lane*, we do not treat the driver's consent as an alternative means by which the police may obtain evidence but, rather, the consent is treated as evidence sought to be excluded. *Id.* at 381. Here, the driver's consent to answer additional questions was obtained by exploiting the illegal detention immediately preceding Deputy's Struve's request.

---

[12] The State did not argue in the district court or in the appellee's brief that Bounmy lacked standing to challenge the validity of the driver's consent.

*See id.* at 383 (applying three main factors in exploitation analysis: temporal proximity, intervening circumstances, and purpose of official misconduct); *see also Pals*, 805 N.W.2d at 784 (finding no break between illegal action and consent to search vehicle). Allowing the deputy to use the driver's consent to justify "escorting" Bounmy to the place where the drugs were discovered would ratify the deputy's prolonging of the traffic stop without reasonable suspicion to do so. Accordingly, we reject the district court's reliance on the driver's consent in denying the motion to suppress.

Because the deputy did not have reasonable suspicion to prolong the traffic stop, all evidence flowing from the stop is inadmissible. We reverse the suppression ruling and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**